**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Laurence John LAYTON,
Defendant–Appellant.**

Nos. 87–1071, 87–2576.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 17, 1988.

Decided Aug. 16, 1988.

Robert R. Bryan and Thomas W. Jackson, San Francisco, Cal., for defendant-appellant.

Sanford Svetcov, Asst. U.S. Atty., Chief, Appellate Section, San Francisco, Cal., for plaintiff-appellee.

Before ALARCON, HALL and KOZINSKI, Circuit Judges.

ALARCON, Circuit Judge:

Laurence John Layton (Layton) appeals from the final judgment entered following his conviction on charges stemming from the November 1978 killing of Congressman Leo J. Ryan at the Port Kaituma airstrip in the Republic of Guyana. Layton challenges his conviction on numerous grounds, each of which is addressed below.

In a separate appeal, Layton challenges the district court's denial of his motion under 28 U.S.C. § 2255 to vacate and set aside his conviction. In his motion, Layton argued that he had received ineffective assistance of counsel at trial, in violation of the sixth amendment.

We ordered the consolidation of Layton's two appeals. We address each in this opinion. For the reasons set forth below, we

affirm both the judgment of conviction and the district court's denial of Layton's motion under § 2255.

## APPEAL NO. 87-1071

### I. PERTINENT FACTS

The Peoples Temple was a religious organization composed primarily of American citizens. In 1977, under the leadership of Jim Jones, the Peoples Temple established a settlement of more than 1,000 people in a remote jungle area of the Republic of Guyana. The settlement was known as Jonestown. Layton was a member of the Temple and resided at Jonestown.

On November 1, 1978, Congressman Leo J. Ryan, U.S. Representative from the 11th Congressional District of California, notified Jones that Ryan would be visiting Jonestown to investigate allegations of poor living conditions and mistreatment of residents. Jones opposed Ryan's visit and announced his opposition in several tape-recorded speeches delivered to the Jonestown community in the days preceding Ryan's arrival. In certain of the speeches, Jones intimated that Ryan would suffer physical harm if he insisted on entering Jonestown. Jones also prepared and circulated among the Jonestown residents a petition opposing Ryan's visit. Layton signed the petition.

On November 17, 1978, Ryan and his party, which included media representatives and concerned relatives of Jonestown residents, arrived in Jonestown. On November 17 and November 18, Ryan met with many of the residents. Some of them requested assistance in leaving Jonestown. In the afternoon of November 18, the members of Ryan's party and the departing residents boarded a truck to be transported to the Port Kaituma airstrip, approximately six miles from Jonestown. At about that time, Layton was seen conversing with Jones. Layton then embraced Jones, obtained a rain poncho, and announced to the departing group that he, Layton, also wished to leave Jonestown. The departing group expressed concern that Layton was merely feigning his desire to leave and that his true intent was to harm those departing from the settlement. Layton was searched and no weapon was found. Ryan then permitted Layton to join the group on the truck.

At about this time, a Jonestown resident attacked Ryan with a knife. Ryan escaped without injury. Ryan had been planning to remain in Jonestown for another night. After the knife attack, he decided to leave with the other members of his party.

The truckload of people departed for the Port Kaituma airstrip. As the truck approached the gate to Jonestown, Joe Wilson boarded. Wilson, a leader of the Jonestown security force, was armed with a gun. En route to the airstrip, Layton talked with another member of Jonestown's security force, who was also a passenger on the truck. Layton himself had been a member of the security force and had been trained in the use of handguns. The security force was under Jones' control.

Ryan had requested two planes to transport the departing group from Port Kaituma to Georgetown, Guyana. The two planes—a nineteen-seat Otter and a six-seat Cessna—landed at the airstrip about 20 minutes after the arrival of the truck carrying the Ryan party.

Ryan's aide assigned seats on the two planes. Layton insisted on being seated in the plane that was scheduled to depart first, the small Cessna.

Prior to boarding the Cessna, Layton was seen conversing with Joe Wilson. Wilson placed his hand underneath the rain poncho Layton was wearing. Ryan and several others began searching those waiting to board the Cessna. Layton left the line and boarded the plane without being searched. Layton was then told to leave the plane and to submit to a search. After first protesting that he had already been searched, Layton complied with the direction. Because no weapons were found on Layton's person, he was permitted to reboard the Cessna.

When boarding of the Cessna was completed, the airplane taxied down the runway in preparation for take-off. Boarding of the Otter was still in progress. A trac-

tor-trailer carrying a group of Peoples Temple members drove in front of the Cessna and headed toward the Otter. The people on the tractor-trailer began shooting at the Otter. The bullets struck passengers seated inside the plane as well as those waiting to board. Ryan, who was standing outside the Otter, was killed in the attack. Richard Dwyer, United States Deputy Chief of Mission to Guyana, was wounded.

When Layton heard the shots being fired at the Otter, he yelled at the pilot of the Cessna to proceed with the take-off. Layton then pulled a gun hidden between his legs and shot two people seated near him. He fired the weapon at the chest of a third person but the gun misfired. Two passengers wrestled with Layton and disarmed him. Two Guyanese civilians then took Layton to the constabulary at Port Kaituma, where Guyanese officials took him into custody.

In an indictment filed October 9, 1980, Layton was charged with conspiring to kill a member of Congress (Ryan), in violation of 18 U.S.C. § 351(d); aiding and abetting in the killing of a member of Congress, in violation of 18 U.S.C. §§ 2 and 351(a); conspiring to murder an internationally protected person (Dwyer), in violation of 18 U.S.C. § 1117; and aiding and abetting in the attempted murder of an internationally protected person, in violation of 18 U.S.C. § 1116(a). At the time the indictment was filed, Layton was being held in custody in Guyana, in connection with charges filed against him in that country. He returned to the United States, in the company of FBI agents, on or about November 20, 1980.

Trial commenced on July 21, 1981. A mistrial was declared on September 26, 1981, when the jury announced that it was unable to reach a verdict. Following two interlocutory appeals by the Government, a second trial commenced on September 18, 1986. On December 1, 1986, the jury returned a verdict of guilty on all counts. On March 3, 1987, Layton was sentenced to fifteen years imprisonment on counts 1, 3, and 4, and to life in prison on count 2.

Additional facts are recited where appropriate in Part III *infra*.

## II. JURISDICTION

The district court's jurisdiction is addressed in Part III(A) *infra*. We have jurisdiction over Layton's appeal from the final judgment entered in this matter pursuant to 28 U.S.C. § 1291 (1982).

## III. DISCUSSION

### A. Did The District Court Have Subject Matter Jurisdiction To Try The Charged Offenses?

■ Layton filed a motion in the district court for dismissal based on lack of subject matter jurisdiction. The district court concluded that it had jurisdiction over the charges contained in the indictment. *United States v. Layton*, 509 F.Supp. 212 (N.D. Cal.1981). Layton appealed from the district court's ruling. We dismissed the appeal as premature, indicating that Layton could challenge subject matter jurisdiction on appeal from final judgment. *United States v. Layton*, 645 F.2d 681 (9th Cir.), *cert. denied*, 452 U.S. 972, 101 S.Ct. 3128, 69 L.Ed.2d 984 (1981). Layton now renews the arguments he presented to the district court. We review a district court's assumption of jurisdiction *de novo*. *United States v. Hill*, 719 F.2d 1402, 1404 (9th Cir.1983).

For the following reasons, we hold that the district court properly exercised subject matter jurisdiction over each count in the indictment.

### 1. *Counts One and Two*

Count One charged Layton with conspiracy to kill Congressman Ryan, in violation of 18 U.S.C. § 351(d). Count Two charged Layton with aiding and abetting in the killing of Ryan, in violation of 18 U.S.C. §§ 351(a) and 2. Sections 351(a) and (d) provide:

(a) Whoever kills any individual who is a Member of Congress ... shall be punished as provided by sections 1111 and 1112 of this title.

. . . . .

(d) If two or more persons conspire to kill ... any individual designated in subsection (a) of this section and one or more of such persons do any act to effect the object of the conspiracy, each shall be punished (1) by imprisonment for any term of years or for life or (2) by death or imprisonment for any term of years or for life, if death results to such individual.

Layton argues that § 351 cannot be applied in this case because the acts in question occurred outside the United States and Congress did not intend § 351 to be applied extraterritorially.

■ Where the language of a criminal statute does not indicate whether the statute is to be applied to extraterritorial conduct, resolution of the question "depends upon the purpose of Congress as evinced by the description and nature of the crime." *United States v. Bowman*, 260 U.S. 94, 97, 43 S.Ct. 39, 40–41, 67 L.Ed. 149 (1922). When a statute describes a crime which is not logically dependent on its locality but which, instead, injures the government wherever the crime occurs, the statute will be applied to U.S. citizens who violate its provisions while outside United States territory. *Id.* The clearest statement of this principle appears in *Skiriotes v. Florida*, 313 U.S. 69, 61 S.Ct. 924, 85 L.Ed. 1193 (1941), where the Court declared: "[A] criminal statute dealing with acts that are directly injurious to the government, and are capable of perpetration without regard to particular locality, is to be construed as applicable to citizens of the United States upon the high seas or in a foreign country, though there be no express declaration to that effect." *Id.* at 73–74, 61 S.Ct. at 928.

We have applied the foregoing principles to federal statutes prohibiting the theft of government property, *see United States v. Cotten*, 471 F.2d 744 (9th Cir.), *cert. denied*, 411 U.S. 936, 93 S.Ct. 1913, 36 L.Ed. 2d 396 (1973), and the concealment of assets in connection with a bankruptcy proceeding, *Stegeman v. United States*, 425 F.2d 984 (9th Cir.) (en banc), *cert. denied*, 400 U.S. 837, 91 S.Ct. 74, 27 L.Ed.2d 70 (1970). Because the statutes at issue in each case were "enacted to serve important interests of government," *Stegeman*, 425 F.2d at 986, and jurisdiction was "not logically dependent upon the locality of violation," *Cotten*, 471 F.2d at 750, we held that Congress must have intended the statutes to apply regardless of where the proscribed acts occurred.

■ The act proscribed by § 351(a)—the killing of a member of Congress—is "directly injurious to the government, and [is] capable of perpetration without regard to particular locality." *Skiriotes*, 313 U.S. at 73–74, 61 S.Ct. at 927–28. The killing of a member of Congress obstructs the governing process, whether the act occurs within or without the United States. Like the statute prohibiting theft of government property, section 351(a) "prohibits conduct which is obstructive of the functions of government. The *locus* of the conduct is not relevant to the end sought by the enactment." *Cotten*, 471 F.2d at 751.

As the district court noted, it would be a "perversion of logic" to infer extraterritorial jurisdiction under statutes governing theft of government property or concealment of assets in bankruptcy yet decline to infer such jurisdiction under a statute prohibiting the killing of a member of Congress. 509 F.Supp. at 220–21. Section 351(a), therefore, should be construed to apply extraterritorially.

Because the underlying substantive statute, § 351(a), reaches extraterritorial conduct, related statutes governing conspiracy and aiding and abetting should also be construed to apply extraterritorially. *See Bowman*, 260 U.S. at 96, 101–02, 43 S.Ct. at 40, 42 (discussing conspiracy and substantive provisions of anti-fraud statute without distinction, and upholding extraterritorial application of conspiracy provision); *Cotten*, 471 F.2d at 749 (focusing discussion on extraterritorial application of substantive theft statute because "there can be no serious doubt as to the extraterritorial applicability of the conspiracy section"); *Brulay v. United States*, 383 F.2d 345, 350 (9th Cir.), *cert. denied*, 389 U.S. 986, 88 S.Ct. 469, 19 L.Ed.2d 478 (1967) (Congress

intended substantive statute to apply to conduct outside the United States, hence corresponding conspiracy statute applied extraterritorially). Accordingly, we ·reject Layton's argument that § 351(d) applies only when the overt act required thereunder occurs within the United States.

### 2. *Counts Three and Four*

Count Three charged Layton with conspiracy to kill Deputy Chief of Mission Richard Dwyer, an internationally protected person, in violation of 18 U.S.C. § 1117. Count Four charged Layton with aiding and abetting the attempted murder of Dwyer, in violation of 18 U.S.C. §§ 2 and 1116. Section 1116(a) makes it a crime to "kill[ ] or attempt[ ] to kill a foreign official, official guest, or internationally protected person." [1] Section 1116(c) provides: "If the victim of an offense under subsection (a) is an internationally protected person, the United States may exercise jurisdiction over the offense if the alleged offender is present within the United States, irrespective of the place where the offense was committed or the nationality of the victim or the alleged offender." Section 1117 forbids conspiracies to commit an act prohibited by § 1116.

Layton argues that § 1116(c)—which requires the offender's presence in the United States—identifies the *only* circumstance in which the courts may exercise jurisdiction over extraterritorial conduct violating § 1116(a). Since he was not present in the United States at the time he was indicted, Layton argues, subject matter jurisdiction is lacking under § 1116(a) and under § 1117, the corresponding conspiracy statute.

The legislative history of § 1116, however, "makes it abundantly clear that the intent of Congress was to pass the legislation necessary to fulfill the obligations of the United States under two treaties" concerning the prevention and punishment of terrorism and crimes against internationally protected persons. 509 F.Supp. at 221–22. "Congress, moreover, clearly intended to enforce the obligations of the United States under the treaties completely." *Id.* at 222. One of these instruments, a U.N. treaty, required signatory states to enact any legislation necessary to establish jurisdiction over specified crimes, including those with which Layton was charged, "when the alleged offender is a national of that State" or "when the crime is committed against an internationally protected person ... who enjoys his status as such by virtue of functions which he exercises on behalf of that State." *Id.* at 222–23 (quoting "Convention on the Prevention and Punishment of Crimes Against Internationally Protected Persons," Art. 3). Congress clearly intended that § 1116 be enforced in such circumstances.

In a separate section, the U.N. treaty required signatory States "to establish jurisdiction over these crimes in cases where the alleged offender is present in its territory and [the State] does not extradite him" to a State that could assert jurisdiction based on the circumstances described above. *Id.* at 223. Congress fulfilled this obligation by enacting § 1116(c). The fact that Congress expressly mentioned only this jurisdictional basis can be explained. "The other ... bases for jurisdiction under the U.N. treaty ... are all tied to some aspect of the events which make up the alleged offense." *Id.* at 223. On the other hand, jurisdiction based on the presence of the alleged offender

> is not grounded on any characteristics of the event itself, but on the location, at any time after the fact, of the alleged offender. This type of jurisdiction had its origins in the special problems and characteristics of piracy. It is only in recent times that nations have begun to extend this type of jurisdiction to other crimes.... It is not surprising, then, that Congress would explicitly write into this legislation the extension of this type of jurisdiction over another type of crime—terrorism—now considered by

---

**1.** Layton does not contend that Dwyer was not an "internationally protected person" within the meaning of the statute.

the international community to be deserving of treatment in a manner traditionally reserved for piracy.

*Id.*

Moreover, it would have made no sense for Congress to enact a statute forbidding the murder or attempted murder of an internationally protected person representing the United States, which crime would likely occur outside the territory of the United States, yet not intend that the prohibition apply to extraterritorial acts.

■ In summary, we agree with the district court that the most reasonable reading of the statute, "in the context of its purpose and origins, is that Congress intended to meet its obligation to take jurisdiction under each of the circumstances delineated in" the U.N. treaty. *Id.* at 224. Since Layton is a national of the United States, and since Dwyer was an internationally protected person by virtue of the functions he exercised on behalf of the United States, the district court would have had jurisdiction to try Layton for the substantive offenses of murdering or attempting to murder Dwyer, even if those acts had occurred outside the territory of the United States. Layton was not charged with these substantive offenses but with conspiracy to murder and with aiding and abetting the attempted murder. As discussed in Part III(A)(1) *supra,* because jurisdiction would be proper over the underlying substantive offenses, it is also proper over the related offenses with which Layton was charged.

B. Did The District Court Err In Admitting Jones' Pre–Arrival Speeches Into Evidence?

1. *Does Fed.R.Evid. 801(d)(2)(E) permit the admission of statements made during the course and in furtherance of a conspiracy that was not charged and that had a legal objective?*

Prior to the commencement of Layton's second trial, the Government sought an *in limine* ruling from the district court concerning the admissibility of certain tape-recorded speeches made by Jones during the days immediately preceding the arrival of the Ryan delegation (the "pre-arrival speeches"). The Government contended that the pre-arrival speeches were admissible as coconspirator's statements under Fed.R.Evid. 801(d)(2)(E).[2] The district court ruled that the pre-arrival speeches were inadmissible because they were not made "in furtherance of" a conspiracy to kill Ryan.

In response to the Government's interlocutory appeal, we ruled that the pre-arrival speeches were in furtherance of a conspiracy to kill Ryan, if indeed such a conspiracy existed when the pre-arrival speeches were made. Because the district court's ruling did not clearly indicate whether the court had found that such a conspiracy was in existence at the time the pre-arrival speeches were made, we remanded for a resolution of that question. *United States v. Layton,* 720 F.2d 548, 558 (9th Cir.1983), *cert. denied,* 465 U.S. 1069, 104 S.Ct. 1423, 79 L.Ed.2d 748 (1984).

On remand, applying the "independent evidence" rule that prevailed in this circuit prior to the decision in *Bourjaily v. United States,* 107 S.Ct. 2775 (1987), the district court found that the Government had failed to proffer sufficient independent evidence to show that a conspiracy to kill Ryan existed when the pre-arrival speeches were made. The court, therefore, ruled initially that the pre-arrival speeches would be excluded.

Later, the district court reconsidered the admissibility of the pre-arrival speeches. The court found that the Government had proffered sufficient evidence to establish that Jones and Layton had participated in a conspiracy to prevent the Ryan delegation from discovering the truth about the conditions at Jonestown. The district court concluded that Rule 801(d)(2)(E) authorizes the admission of a coconspirator's statements

---

**2.** Rule 801(d)(2)(E) provides, in pertinent part: "A statement is not hearsay if ... [t]he statement is offered against a party and is ... a statement by a coconspirator of a party during the course and in furtherance of the conspiracy."

made during the course and in furtherance of any common enterprise involving the defendant and the declarant, provided that such common enterprise was "factually intertwined" with the charged conspiracy. Based on this construction of Rule 801(d)(2)(E), the court admitted into evidence the pre-arrival speeches.

Layton argues that the district court "erred in applying the co-conspirator exception ... to legal conduct not alleged in the indictment." He contends that Rule 801(d)(2)(E) is inapplicable unless the statement sought to be admitted was made during the course and in furtherance of either (1) the charged conspiracy, (2) a conspiracy underlying the charged substantive offense, or (3) a conspiracy to accomplish an illegal objective or to accomplish a legal objective by illegal means. Layton argues that the cases on which the district court relied are distinguishable and not binding in this circuit.

■ Whether the district court correctly construed Rule 801(d)(2)(E) is a question of law we review *de novo*. *United States v. McConney*, 728 F.2d 1195, 1200–01 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824 (1984); *United States v. McClintock*, 748 F.2d 1278, 1287 (9th Cir.1984), *cert. denied*, 474 U.S. 822, 106 S.Ct. 75, 88 L.Ed.2d 61 (1985).

■ Statements of a coconspirator qualify as nonhearsay under Rule 801(d)(2)(E) if they were made during the course and in furtherance of a "concert of action" between the declarant and the defendant. *United States v. Williams*, 435 F.2d 642, 645 (9th Cir.1970), *cert. denied*, 401 U.S. 995, 91 S.Ct. 1241, 28 L.Ed.2d 533 (1971); *Fuentes v. United States*, 283 F.2d 537, 539–40 (9th Cir.1960). A coconspirator's statement is admissible upon proof that it was made in furtherance of a conspiracy, notwithstanding the fact that the indictment does not contain a conspiracy count. *United States v. Gonzalez*, 715 F.2d 1411, 1412 (9th Cir.1983) (quoting *Williams*, 435 F.2d at 645). "[T]he question is merely whether there was proof of a sufficient concert of action to show the individuals to have been engaged in a joint venture."

*United States v. Everidge*, 488 F.2d 1, 3 (9th Cir.1973); *see* S.Rep. No. 93–1277, 93d Cong., 2d Sess. 24 (1974), *reprinted in* 1974 U.S.Code Cong. & Admin.News 7051, 7073 ("While the rule refers to a coconspirator, it is this committee's understanding that the rule is meant to carry forward the universally accepted doctrine that a joint venturer is considered as a coconspirator for the purposes of this rule even though no conspiracy has been charged.").

Thus, the common enterprise or joint venture on which admission of a coventurer's statement is based need not be the same as the charged conspiracy, if any. The novel question before us is whether the common enterprise or joint venture must have an illegal objective. The rationale underlying Rule 801(d)(2)(E) supports the conclusion reached by the district court, *i.e.*, that the common enterprise need not have an illegal objective.

The theoretical justification for the rule that a coconspirator's statements are admissible comes from the law of agency. "Declarations of one conspirator may be used against the other conspirator not present on the theory that the declarant is the agent of the other, and the admissions of one are admissible against both under a standard exception to the hearsay rule applicable to the statement of a party." *Lutwak v. United States*, 344 U.S. 604, 617, 73 S.Ct. 481, 489, 97 L.Ed. 593 (1953). To the same effect is our decision in *Fuentes*, in which we quoted with approval the following language from a leading Second Circuit opinion:

> The notion that the competency of the declarations of a confederate is confined to prosecutions for conspiracy has not the slightest basis; their admission does not depend upon the indictment, but is merely an incident of the general principle of agency that the acts of any agent, within the scope of his authority, are competent against his principal.

*Fuentes*, 283 F.2d at 539 (quoting *United States v. Olweiss*, 138 F.2d 798, 800 (2d Cir.1943) (Hand, J.), *cert. denied*, 321 U.S. 744, 64 S.Ct. 483, 88 L.Ed. 1047 (1944)). As the district court correctly noted, "*Olweiss*

established a doctrinal basis for an expansive reading of the coconspirator exception: provided that an adequate agency relationship exists, the statements of a coconspirator, or agent, are admissible...." *But see United States v. Cambindo Valencia,* 609 F.2d 603, 635 n. 25 (2d Cir.1979) ("The rationales generally advanced in support of the coconspirator exception, including the 'agency' theory ..., offer scant guidance" on the question whether coconspirator's statement may be admitted on the basis of "another conspiracy found to exist in the factual pattern of the case"), *cert. denied,* 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 795 (1980).

█ If the appropriate basis for admitting the statements of a confederate is that his participation in a common enterprise with the defendant makes him an agent of the accused, then the goal or objective of the common enterprise would appear to be irrelevant. The critical inquiry is simply whether the confederate was acting in his capacity as an agent of the defendant when he uttered the statements sought to be admitted, *i.e.,* whether the statements were made "during the course and in furtherance of" the common enterprise. *See In re Japanese Electronic Products Antitrust Litigation,* 723 F.2d 238, 262–63 (3d Cir. 1983) (rejecting argument that proponent of coconspirator's statements must show that the conspiracy was unlawful) (coconspirator's statement admissible if proponent shows "that there was a joint undertaking, that the statement was made to advance that undertaking, and that the party against which the statements are offered was a party to that undertaking"), *rev'd on other grounds sub nom. Matsushita Elec. Ind. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *United States v. Saimiento–Rozo,* 676 F.2d 146, 149 (5th Cir.1982) ("[I]t is not necessary that the conspiracy upon which admissibility of these statements is predicated be the conspiracy charged.... Nor need the conspiracy or agreement be criminal in nature; it may be in the form of a joint venture.").

The decisions of other circuits, in addition to those cited in the preceding paragraph, support the foregoing analysis. *See, e.g., United States v. Coe,* 718 F.2d 830, 835–36 & n. 3 (7th Cir.1983) (unlike the crime of conspiracy, which "comprehends much more than just a joint venture or concerted action, ... the evidentiary rule of conspiracy is founded on concepts of agency law"; government need not establish that conspiracy or joint venture was illegal in order to invoke coconspirator hearsay exception); *United States v. Weisz,* 718 F.2d 413, 433 (D.C.Cir.1983) (Rule 801(d)(2)(E) embodies "concepts of agency and partnership law"; although the Rule "refers to 'conspiracy' and statements of a 'coconspirator,' its use of those terms is not intended to limit applicability of the doctrine to unlawful combinations"), *cert. denied,* 465 U.S. 1027 & 1034, 104 S.Ct. 1285, 79 L.Ed.2d 688 (1984); *United States v. Postal,* 589 F.2d 862, 886 n. 41 (5th Cir.) ("[T]he agreement [upon which admissibility of a joint venturer's statement is predicated] need not be criminal in nature."), *cert. denied,* 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 40 (1979); *United States v. Trowery,* 542 F.2d 623, 626–27 (3d Cir.1976) (coconspirator exception to hearsay rule is "founded, to some extent, on concepts of agency law," is applicable "in both civil and criminal cases," and renders a statement competent as against the nondeclarant upon a showing "that a *joint undertaking* existed at the time of the statement") (emphasis added), *cert. denied,* 429 U.S. 1104, 97 S.Ct. 1132, 51 L.Ed.2d 555 (1977). The gist of the case law has been accurately summarized by one commentator as follows:

Modern authority indicates that the essense of the coconspirator exception is a "combination" among the coventurers, hence that the proponent of a coconspirator statement need not establish by independent evidence that the conspiracy is unlawful. This holding goes far to assure that *the coconspirator exception is indeed more properly understood as a "joint venture" exception whose essence is an agreement among the members to pursue some common plan.*

4 D. Louisell & C. Mueller, *Federal Evidence* § 427, at 125 (Supp.1987) (footnote omitted; emphasis added).

We note that some cases contain language suggesting that an *unlawful* joint venture must be shown before a coventurer's statement may be admitted against the defendant. *See, e.g., United States v. Garcia–Duarte*, 718 F.2d 42, 45 (2d Cir.1983) (quoting *United States v. Terry*, 702 F.2d 299, 320 (2d Cir.), *cert. denied*, 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983), quoting *United States v. Ragland*, 375 F.2d 471, 477 (2d Cir.1967), *cert. denied*, 390 U.S. 925, 88 S.Ct. 860, 19 L.Ed.2d 987 (1968)) ("[T]he totality of the independent evidence marshalled by the prosecution must establish at least the 'likelihood of an *illicit* association between the declarant and the defendant.'") (emphasis added in *Terry*); *United States v. Di Rodio*, 565 F.2d 573, 575 (9th Cir.1977) ("To be admissible the statement must be in furtherance of the conspiracy and be made during the pendency of the criminal scheme."). In none of these cases, however, was the court addressing the issue now before us— the admissibility of a statement made during the course of a legal joint venture between the declarant and the defendant.

Layton relies principally on the Supreme Court's language in *Anderson v. United States*, 417 U.S. 211, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974). The Court in *Anderson* observed that "[t]he hearsay-conspiracy exception applies only to declarations made while the conspiracy charged was still in progress, a limitation that this Court has 'scrupulously observed.'" *Id.* at 218, 94 S.Ct. at 2259. The Court elaborated in a footnote:

> The rationale for both the hearsay-conspiracy exception and its limitations is the notion that conspirators are partners in crime. As such, the law deems them agents of one another. And just as the declarations of an agent bind the principal only when the agent acts within the scope of his authority, so the declaration of a conspirator must be made in furtherance of the conspiracy charged in order to be admissible against his partner.

*Id.* at 218 n. 6, 94 S.Ct. at 2259 n. 6 (citations omitted).

Layton focuses on the Court's references to "the conspiracy charged" as support for his argument that the hearsay-conspiracy exception is available only when the Government demonstrates defendant's participation in an *unlawful* concert of action. The *Anderson* Court, however, was not responding to an argument that an uncharged conspiracy or a lawful concert of action could not support admission of a coconspirator's statement, but to a contention that such a statement is admissible even if uttered after the termination of the charged conspiracy. The Court was simply reiterating the established principle that the conspiracy, or common enterprise, must have been in progress at the time the statement sought to be admitted was made. Indeed, as the district court in the instant matter noted, "[n]o circuit court has ever held that *Anderson* requires that the predicate for admissibility under the exception be the precise conspiracy charged in the indictment."

For the reasons discussed above, we conclude that the district court correctly determined that Rule 801(d)(2)(E) applies to statements made during the course and in furtherance of any enterprise, whether legal or illegal, in which the declarant and the defendant jointly participated.

> 2. *Did the district court err in finding that the Government presented sufficient evidence to establish Jones' and Layton's participation in a conspiracy to conceal the truth about the conditions at Jonestown?*

Having concluded that the district court's construction of Rule 801(d)(2)(E) was correct, we next determine whether the Government presented sufficient evidence to establish that Jones and Layton were participants in a conspiracy, or common enterprise, to conceal from Congressman Ryan the truth about the conditions at Jonestown.

Applying the standard of proof prescribed by this circuit's law prior to the decision in *Bourjaily*, the district court

found that the petition circulated by Jones and signed by Layton prior to Ryan's arrival constituted *prima facie* evidence of a common enterprise to conceal the truth about the conditions at Jonestown. The petition, dated November 9, 1978, declared:

> Many of us, the undersigned residents of Jonestown, Guyana, have been visited here by friends and relatives. However, we have not invited and do not care to see Congressman Ryan (supporter of military aid to the Pinochet regime of Chile), media representatives, members of a group of so-called "concerned relatives," or any other persons who may be travelling with, or associated with, any of these persons.

The court concluded that "[t]he preparation of the petition, the effort that went into its distribution and dissemination, and the hundreds of signatures on the petition all indicate a concerted common enterprise to dissuade Congressman Ryan from visiting Jonestown and learning the truth about the conditions there."

■ Subsequent to the trial in this matter, the Supreme Court held that the existence of a conspiracy, or common enterprise, in which both the declarant and the defendant participated are preliminary facts that must be shown by a *preponderance of the evidence. Bourjaily*, 107 S.Ct. at 2779. The Court further held that in assessing whether the preliminary facts have been demonstrated, the court may consider the coconspirator's statements themselves. *Id.* at 2780. Accordingly, in assessing whether the "preponderance" standard announced in *Bourjaily* was satisfied in the present case, we consider not only the evidence of the petition, which was the sole evidence on which the district court relied, but also the pre-arrival speeches themselves.[3]

In a speech on November 14, 1978, Jones stated that if Ryan and his delegation "en-

ter this property illegally, they will not leave it alive." In a speech on November 17, 1978, Jones claimed "the right to shoot him [Ryan] in the ass" and threatened that "if he stays long enough for tea he's gonna regret it." Later in the same speech, Jones declared: "I want to shoot someone in the ass like him so bad, so long, I'm not passing this opportunity up. Now if they come in, they come in on their own risk."

These speeches, considered in conjunction with the petition circulated by Jones and signed by Layton, demonstrate by at least a preponderance of the evidence that Jones and Layton were participants in a common enterprise to prevent Ryan from discovering and revealing the truth about the living conditions at Jonestown. Thus, the pre-arrival speeches were admissible as statements of a coconspirator.

### 3. Did the admission of Jones' pre-arrival speeches violate Layton's sixth amendment right to confront and cross-examine witnesses?

■ Layton argues that even if it can be assumed that Rule 801(d)(2)(E) permits admission of a coconspirator's statements on the basis of an uncharged, legal common enterprise, and that the Government presented sufficient evidence of such an enterprise in this case, the admission of Jones' pre-arrival speeches into evidence violated Layton's sixth amendment right to confront and cross-examine witnesses.

Layton's argument was answered by the Supreme Court in *Bourjaily*. There, the Court held that "the requirements for admission under Rule 801(d)(2)(E) are identical to the requirements of the [c]onfrontation [c]lause." 107 S.Ct. at 2782. When a coconspirator's statement satisfies the requirements for admission under Rule 801(d)(2)(E), it satisfies the requirements of the confrontation clause, as well. Accordingly, "the [c]onfrontation [c]lause does not

---

**3.** Although the district court judge did not consider the pre-arrival speeches in assessing their admissibility, no purpose would be served by remanding this matter to permit him to determine whether those speeches, together with the evidence he previously considered, would establish the existence of a conspiracy by a preponderance of the evidence. The pre-arrival speeches were recorded. The district court is in no better position than we are to assess the quantum of such non-testimonial evidence for the purpose of determining whether the foundational requirements for admission of a coconspirator's statements have been met.

require a court to embark on an independent inquiry into the reliability of statements that satisfy the requirements of Rule 801(d)(2)(E)." *Id.* at 2783 (footnote omitted). Thus, Layton's sixth amendment objection to admission of the pre-arrival speeches must be rejected.

4. *Should the district court have excluded Jones' pre-arrival speeches under Fed.R.Evid. 403?*

Layton also claims that the district court erred in failing to exclude the pre-arrival speeches under Fed.R.Evid. 403, because "the statements were confusing, and contained inflammatory language that must surely have prejudiced the jury." Layton contends that the probative value of the pre-arrival speeches was minimal because their truthfulness was in doubt.

Rule 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

In applying Rule 403, the district court must balance "the probative value of the evidence against the effect of its non-probative aspect—and [must] assess the danger that admission of the evidence will *unfairly* prejudice the defendant." *United States v. Bailleaux*, 685 F.2d 1105, 1111 (9th Cir.1982). The evidence should be excluded "[w]hen the effect on the jury of the non-probative aspect of the evidence is likely to be substantially greater than the effect of the probative aspect. . . ." *Id.*

▪ We review a district court's decision under Rule 403 with considerable deference.

The Rule 403 weighing process—that of balancing the probative value of the proffered evidence against its potential for unfair prejudice or confusion of the issues—is primarily for the district court to perform. The district court's admission or exclusion of evidence under Rule 403 will be reversed only if it was an abuse of discretion.

*United States v. Layton*, 767 F.2d 549, 553 (9th Cir.1985) (citation omitted); *accord Palmerin v. City of Riverside*, 794 F.2d 1409, 1411 (9th Cir.1986) ("We will uphold rulings on the admissibility of evidence unless admitting the evidence was an abuse of discretion.").

▪ The pre-arrival speeches are highly probative of the state of mind of the participants in the common enterprise to conceal the truth from Congressman Ryan. The pre-arrival speeches reveal antipathy towards Ryan, resistance to his impending visit, and an intent to harm him if he insists on coming to Jonestown. Whether the speeches were truthful was a question for the jury to decide. The speeches undoubtedly prejudiced Layton, but Rule 403 precludes only *unfair* prejudice. Layton fails to explain how the speeches unfairly prejudiced him.

In short, the probative value of the speeches clearly outweighed the prejudicial effect of their admission into evidence. The district court did not abuse its discretion in refusing to exclude the pre-arrival speeches under Rule 403.

C. Did The District Court Err In Admitting Jones' Statements To Attorney Garry?

1. *Is the present panel bound by this court's prior decision on this issue?*

Prior to Layton's second trial, the Government requested that the district court issue an *in limine* ruling that certain statements made by Jones to Charles Garry, attorney for the Peoples Temple, were admissible. The Government contended that Jones' statements to Garry were admissible under Fed.R.Evid. 804(b)(3) as declarations against Jones' penal interest. The district court denied the Government's motion.

The Government filed an interlocutory appeal seeking reversal of the district court's ruling that the statements were not against Jones' penal interest. We reversed. We concluded that the proffered statements satisfied the requirements of Rule 804(b)(3). *Layton*, 720 F.2d at 559–

60. Layton now raises the same issue previously decided by this court, *i.e.*, whether Jones' statements to Garry were admissible under Rule 804(b)(3) as statements against Jones' penal interest. He "requests that this court reconsider its prior order based on the actual trial testimony."

■ Under the rule of "law of the case," the panel hearing a second appeal in a single case will ordinarily refrain from reconsidering an issue adjudicated on the merits in the earlier appeal. *Moore v. Jas. H. Matthews & Co.*, 682 F.2d 830, 833 (9th Cir.1982). "[T]he discretion of a court to review earlier decisions should be exercised sparingly so as not to undermine the salutary policy of finality that underlies the rule." *Id.* at 834. Nevertheless, when " 'the evidence on a subsequent trial was substantially different' " from the evidence on which the first panel based its decision, the second panel "will exercise [its] discretion to reconsider [the] prior decision." *United States v. Houser*, 804 F.2d 565, 568 (9th Cir.1986) (quoting *Moore*, 682 F.2d at 834, quoting *White v. Murtha*, 377 F.2d 428, 431–32 (5th Cir.1967)).

■ We must decide whether the evidence presented at Layton's second trial was "substantially different" from the record we reviewed in deciding the interlocutory appeal from the pretrial order. Our earlier decision was based on the Government's representation of the evidence that it would offer at trial. We summarized the proffered evidence as follows:

> The government ... seeks the admission of testimony by Garry, Jones' lawyer, that shortly after the Ryan party left for the airstrip Jones told him that Layton and Parks had taken all the weapons from Jonestown and were proceeding to the airstrip to engage in violent acts; that all was lost at that time; that Layton was not a defector, but was going to the airstrip to carry out a mission of violence.

720 F.2d at 558.

Garry's testimony at the second trial differed from the Government's offer of proof. The Government concedes that contrary to its proffer, Garry did not attribute to Jones an express statement that Layton was going to the airstrip to engage in violent acts. Garry testified that Jones made the following statements: (1) "Charles, every gun in this place is gone." (2) "Charles, I am worried. When Larry Layton left he hugged me and said the shit has got to stop. Joe Wilson and Gerry Parks have also left. They have taken every gun in the place. There is not a gun left." (3) "Parks ... and Layton were not really defectors." (4) "Charles, all is lost. Every gun in this place is gone." (5) "Larry Layton and Jerry Parks, they didn't defect. They were part of this, they've got all the guns." (6) "[W]hen Larry Layton came to me, he said he loved me, and he said, you're going to be proud of me.... I felt that perhaps he may have had a gun on him at that time."

The Goverment's representation that Jones told Garry that Layton was "proceeding to the airstrip to engage in violent acts" and that Layton's purpose was "to carry out a mission of violence" were clearly the most significant statements in the Government's offer of proof, and directly implicated Jones in a conspiracy that culminated in the violent acts that actually took place. Indeed, our prior decision was based, in part, on the fact that Jones' statements indicated that he "had detailed knowledge of the events that were about to transpire." 720 F.2d at 560.

Because the evidence presented at Layton's retrial was substantially different from the offer of proof relied upon in the interlocutory appeal, we will exercise our discretion to reconsider the admissibility of Jones' statements to Garry in light of the evidence actually presented at the second trial.

2. *Were Jones' statements to Garry admissible as declarations against a penal interest?*

Fed.R.Evid. 804 states, in pertinent part:

(b) *Hearsay exceptions.* The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

. . . . .

(3) *Statement against interest.* A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, ... that a reasonable man in his position would not have made the statement unless he believed it to be true.

Fed.R.Evid. 804(b)(3). Our earlier opinion sets forth the principles governing the interpretation of the statement against interest exception to the hearsay rule:

> In interpreting the "against interest" requirement [of Rule 804(b)(3) ], we have often stated that Congress's use of the phrase "tend to subject" illustrates its desire that this type of evidence be freely admissible. Thus, we have held that rule 804(b)(3) is not limited to confessions of criminal responsibility, although the statements must, in a real and tangible way, subject declarants to criminal liability.... We have held that remarks that tend to implicate the declarant in a conspiracy are statements against his penal interest.

*Layton,* 720 F.2d at 559–60 (citations omitted); *see United States v. Satterfield,* 572 F.2d 687, 691 (9th Cir.), *cert. denied,* 439 U.S. 840, 99 S.Ct. 128, 58 L.Ed.2d 138 (1978) (quoting *United States v. Benveniste,* 564 F.2d 335, 341 (9th Cir.1977)) ("If Congress had wanted courts to take a restrictive approach to whether a statement is against penal interest, it would not have chosen 'the broadly worded phrase "tended to subject" ' in Rule 804(b)(3).").

██ Under the foregoing principles, Jones' statements to Garry were properly admitted under Rule 804(b)(3) as declarations against Jones' penal interest. Jones had the exclusive power to determine who could carry a gun at Jonestown. His statements that Layton and others had taken all the guns when they departed for the airstrip, that Layton was not a true defector, that he (Jones) was worried, and that "all is

lost," when construed together, tended to implicate Jones in an unlawful conspiracy to harm the members of the departing congressional delegation. As noted in our prior opinion, "[b]ecause Jones had control over most events in Jonestown, he would have known that acts of his followers ... would be attributed to him." 720 F.2d at 560. It can be logically inferred from his statements to Garry that Jones suspected Layton would engage in unlawful acts, and that Jones knew that he (Jones) would be suspected of directing the violence against Congressman Ryan. Thus, Jones' statements to Garry "tended to subject" Jones to criminal liability for conspiracy.[4] The statements were declarations against Jones' penal interest admissible pursuant to Rule 804(b)(3).

3. *Did admission of Jones' statements to Garry violate Layton's sixth amendment right to confront and cross-examine witnesses?*

Layton argues that even if Jones' statements to Garry were declarations against penal interest, admission of this evidence violated Layton's sixth amendment right to confront and cross-examine witnesses against him because they bore insufficient indicia of reliability. *See California v. Green,* 399 U.S. 149, 155–56, 90 S.Ct. 1930, 1933–34, 26 L.Ed.2d 489 (1970) (admission into evidence of out-of-court statement may violate confrontation clause even though statement falls within a recognized exception to hearsay rule).

Layton presented this argument in the prior appeal of this issue. We rejected it. 720 F.2d at 561. However, as discussed in Part III(C)(1) *supra,* Garry's trial testimony was substantially different from the proffered evidence previously presented to this court. Accordingly, we review *de novo* Layton's sixth amendment argument.

The right of an accused to cross-examine witnesses is guaranteed by the confronta-

---

**4.** The trial record establishes that Garry's client was the Peoples Temple, not Jones individually. Jones' statements to Garry, therefore, were not privileged *as to Jones. See* Part III(C)(4) *infra.* Accordingly, we need not decide whether a statement made by a client to his attorney is nevertheless admissible, and not protected by the attorney-client privilege, if it is against a penal interest.

tion clause. U.S. Const. art. VI, cl. 2. "[T]he clause is given a pragmatic rather than a rigid, literal construction." *Barker v. Morris,* 761 F.2d 1396, 1399 (9th Cir. 1985), *cert. denied,* 474 U.S. 1063, 106 S.Ct. 814, 88 L.Ed.2d 788 (1986). Thus, the Supreme Court has held that the requirements of the confrontation clause are satisfied when the prosecution demonstrates "both the unavailability of the declarant and … 'indicia of reliability' surrounding the out-of-court declaration." *Bourjaily,* 107 S.Ct. at 2782 (quoting *Ohio v. Roberts,* 448 U.S. 56, 65–66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980)); *see United States v. Monaco,* 735 F.2d 1173, 1175 (9th Cir.1984) ("An out-of-court statement may be admissible against the accused if it is necessary and reliable.").

In the present case, the declarant, Jones, is deceased, hence unavailable. The focus of our inquiry, therefore, must be whether Jones' statements to Garry manifest sufficient indicia of reliability to justify their admission into evidence, notwithstanding that Layton has had no opportunity to cross-examine the declarant.[5]

■ Whether an out-of-court statement bears sufficient indicia of reliability to satisfy the requirements of the confrontation clause depends on the particular circumstances under which the statement was uttered: "There is no mechanical test for determining the reliability of out-of-court statements…. Each case must be evaluated on its own facts…. The test … is whether the factors surrounding the making of the out-of-court statement, taken as a whole, indicate trustworthiness…." *Barker,* 761 F.2d at 1400, 1403.

Thus, courts assess the reliability of out-of-court statements by considering a variety of factors. These factors include the following questions:

1. Was the statement made voluntarily? *Id.* at 1401; *Steele v. Taylor,* 684 F.2d 1193, 1204 (6th Cir.1982), *cert. denied,* 460 U.S. 1053, 103 S.Ct. 1502, 75 L.Ed.2d 932 (1983);

2. Was the statement made contemporaneously with the occurrence of the events it references? *United States v. Nick,* 604 F.2d 1199, 1204 (9th Cir.1979) (per curiam);

3. Did the declarant admit that he committed acts contrary to his penal interest or likely to bring him into disrepute? *Barker,* 761 F.2d at 1401–02;

4. Was the statement corroborated? *Id.* at 1402; *Nick,* 604 F.2d at 1204; *United States v. West,* 574 F.2d 1131, 1135 (4th Cir.1978);

5. Did the declarant have personal knowledge of the matters addressed in the statement? *Barker,* 761 F.2d at 1402;

6. Was the statement uttered spontaneously? *Dutton v. Evans,* 400 U.S. 74, 88–89, 91 S.Ct. 210, 219–20, 27 L.Ed.2d 213 (1970) (plurality); and

7. Was the person to whom the statement was made someone to whom the declarant would likely speak truthfully? *Nick,* 604 F.2d at 1204. It should be reiterated, however, that "[t]he reliability factors discussed in other cases 'are not to be considered exhaustive, nor are all factors required to be present in order to admit the declarations.' " *Barker,* 761 F.2d at 1403 (quoting *United States v. Fleishman,* 684 F.2d 1329 (9th Cir.), *cert. denied,* 459 U.S. 1044, 103 S.Ct. 464, 74 L.Ed. 2d 614 (1982)).

■ Considering all the circumstances surrounding Jones' statements to Garry, we find that these declarations exhibit sufficient indicia of reliability to satisfy the requirements of the confrontation clause.

---

5. An out-of-court statement is presumptively reliable if it "falls within a firmly rooted hearsay exception." *Roberts,* 448 U.S. at 66, 100 S.Ct. at 2539. The Supreme Court has not decided whether the declaration against penal interest is such an exception. Four justices, however, have issued an opinion so finding. *See Lee v. Illinois,* 476 U.S. 530, 551–52, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986) (Blackmun, J., joined by Burger, C.J., Powell & Rehnquist, JJ.). This court has expressly reserved the question without deciding it. *See Monaco,* 735 F.2d at 1176. In light of our conclusion that Jones' statements to Garry exhibit sufficient indicia of reliability to satisfy the requirements of the confrontation clause, we do not decide whether declarations falling within the scope of Rule 804(b)(3) are presumptively reliable.

Jones' statements were uttered voluntarily to a trusted advisor—the lawyer for the Peoples Temple. Such a situation is "suggestive of reliability." *Layton,* 720 F.2d at 561. Jones made the statements very shortly after Layton's departure, while the matters addressed were undoubtedly fresh in his mind. Jones' statements were subsequently corroborated in important respects —Layton did have a gun, and he was feigning defection. Moreover, the statements were adverse to Jones' penal interest. *See* Part III(C)(2) *supra.*

In addition to the presence of the aforementioned factors suggesting reliability, we note the absence of certain factors that have been held to suggest *un* reliability. Jones was not in custody when he spoke to Garry, he was not seeking to curry favor with anyone, and his statements "do not seem designed to cast blame on Layton." *Layton,* 720 F.2d at 561; *cf. Lee v. Illinois,* 476 U.S. 530, 546, 106 S.Ct. 2056, 2065, 90 L.Ed.2d 514 (1986) ("a codefendant's confession inculpating the accused is inherently unreliable").

Cutting against a finding of reliability, however, is the fact that Jones' statements were erroneous in certain respects. Contrary to Jones' statements to Garry, not all the guns had been taken from the settlement, and Gerald Parks was not feigning defection.

Nevertheless, considering all the circumstances surrounding the utterance of Jones' statements to Garry, we conclude that these declarations exhibit sufficient indicia of reliability to satisfy the requirements of the confrontation clause.

### 4. Were Jones' statements to Garry inadmissible as privileged?

Layton also argues that the district court erred in admitting Jones' statements to Garry into evidence because they were privileged, attorney-client communications. The district court did not address this issue.

"The burden of establishing the existence of the attorney-client privilege, and of presenting the underlying facts demonstrating the existence of the privilege rests on the claimant of the privilege." *United States v. Osborn,* 561 F.2d 1334, 1339 (9th Cir.1977).

■ The attorney-client privilege applies only if the party claiming the privilege "is or sought to become a client." *United States v. Osborn,* 409 F.Supp. 406, 409 (D.Or.1975) (quoting *United States v. United Shoe Machinery Corp.,* 89 F.Supp. 357, 358–59 (D.Mass.1950)), *aff'd in part & rev'd in part on other grounds,* 561 F.2d 1334 (9th Cir.1977). In addition, the privilege can be invoked only at the instance of the client. *See id.* (quoting 8 Wigmore, Evidence § 2292 (McNaughton rev. 1961) (communication to lawyer for purpose of seeking legal advice "made in confidence ... by the client ... are *at his instance* permanently protected" from disclosure) (emphasis added). Finally, "[a] litigant is entitled to object to adverse testimony by a former attorney only when such testimony would tend to reveal matters disclosed *by the litigant* in confidence." *United States v. Mackey,* 405 F.Supp. 854, 858 (E.D.N.Y. 1975) (emphasis added).

■ Layton has failed to bear his burden of establishing the facts underlying the existence of an attorney-client privilege. First, Layton made no showing that he was or sought to become Garry's client. The mere fact that Garry represented the Peoples Temple, of which Layton was a member, does not establish that Layton was Garry's client. *See United States v. Keplinger,* 776 F.2d 678, 700 (7th Cir.1985), *cert. denied,* 476 U.S. 1183, 106 S.Ct. 2919, 91 L.Ed.2d 548 (1986) (attorneys representing corporation had no attorney-client relationship with individual employees, where "no express agreement for individual representation was made" and where employees never asked attorney directly or indirectly to represent them). The privilege may only be invoked by the client of an attorney. Layton has failed to show that he is authorized to invoke the privilege on behalf of the Peoples Temple.

Finally, the statements at issue were communications made by Jones. No evidence was offered that Layton made a

statement to Garry. In fact, Garry testified that he first saw Layton at the second trial. Jones' statements to Garry were not protected by the attorney-client privilege.

### D. Did The District Court Err In Admitting The Testimony Of Constable Kansinally?

Layton contends that the district court erred in permitting the Government to present the testimony of Mortimer Kansinally, a supernumerary constable in Port Kaituma at the time of the shootings. Kansinally testified as follows concerning his initial conversation with Layton upon the latter's arrival at the constabulary:

Q. And what did you say?

A. I said, "you [Layton] was involved in the shooting?" He said, "Yes. I shot the motherfuckers." I said, "What?" He said, "I shot the fuckers."

Layton contends that because of "the passage of time and the distance from the scene of the events giving rise to the charges, coupled with the inherent difficulties presented by impaired communication facilities within Guyana, two important witnesses for the defense could not be produced." Layton asserts that the witnesses in question, Durga Persaud and Clement Liladrie, were present when Kansinally confronted Layton and could have impeached Kansinally's testimony concerning Layton's remarks. Layton claims that his inability to procure the testimony of Persaud and Liladrie mandated the exclusion of Kansinally's testimony. Layton claims that admission of the Kansinally testimony violated Layton's rights under the confrontation and due process clauses. He also argues that the testimony should have been excluded under Fed.R.Evid. 403 because it was highly prejudicial and minimally probative.

### 1. Did admission of Kansinally's testimony violate Layton's sixth amendment right to cross-examine witnesses?

 Layton contends that because he was unable to secure the presence of Persaud and Liladrie as witnesses to impeach Kansinally, Layton's rights under the confrontation clause were violated. Layton correctly notes that "a primary interest secured by [the confrontation clause] is the right of cross-examination," *Douglas v. Alabama*, 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934 (1965), and that "the cross-examiner has traditionally been allowed to impeach, *i.e.*, discredit, the witness," *Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974).

These rights were secured to Layton in the present case. Kansinally appeared and testified in court, and Layton's counsel thoroughly cross-examined the witness. Indeed, defense counsel succeeded in impeaching the witness in certain respects. Moreover, the district court permitted the defense to read into evidence prior sworn statements given by Persaud and Liladrie in Guyana. In short, Layton had a full and unrestricted opportunity to cross-examine the witness against him.

This case, therefore, is distinguishable from the cases on which Layton relies. In each of those cases, counsel for the defense was prevented from cross-examining a witness for the prosecution. *See Davis*, 415 U.S. at 311, 94 S.Ct. at 1107–08 (trial court barred defense counsel from cross-examining witness concerning certain matters that might have shown bias and prejudice); *Douglas*, 300 U.S. at 416–17, 85 S.Ct. at 1075–76 (witness asserted privilege against self-incrimination, thereby preventing defense counsel from cross-examining witness concerning witness's confession which implicated defendant and which had been read to jury by prosecution).

 Layton contends, in effect, that the confrontation clause guarantees that no witness will be permitted to testify against the defendant unless witnesses who might impeach that testimony are also available to testify. Layton cites no case to support this proposition. Perhaps Layton's impeachment of Kansinally would have been more effective had Layton been able to secure the presence of Liladrie and Persaud. Liladrie reportedly died in Guyana shortly before the second trial, and Per-

saud disappeared in the United States six years earlier during the first trial. The confrontation clause guarantees that the defendant will have an *opportunity* to cross-examine and impeach the witnesses against him, not that the impeachment will be effective or that the witnesses whose testimony might be helpful in the impeachment will be alive and available as witnesses at trial. Because Layton confronted Kansinally and freely cross-examined him, without any restriction imposed by the district court, no confrontation clause violation occurred.

2. *Did admission of Kansinally's testimony violate Layton's fifth amendment right to due process, in light of Layton's inability to obtain witnesses to impeach Kansinally?*

■ Layton argues that he was "deprived of due process of law by the delay caused by the government's [interlocutory] appeals." He argues that the delay was the cause of his inability to secure the presence of Persaud and Liladrie to impeach the testimony of Kansinally.

"[D]ue process is not violated unless a material witness's unavailability is attributable to unilateral government action." *United States v. Gonzales,* 617 F.2d 1358, 1363 (9th Cir.1980); *accord United States v. Hernandez–Gonzalez,* 608 F.2d 1240, 1244 (9th Cir.1979) (analyzing Ninth Circuit cases and concluding that unavailability of witness does not constitute denial of due process "unless the unavailability . . . is the result of unilateral, overt action by the government").

The Government asserts, and Layton does not deny, that Persaud disappeared on his own initiative during Layton's first trial. In fact, it appears that Persaud was available and under subpoena by the defense during that trial, but was not called to contradict Kansinally. Nor did Layton make any effort to preserve Persaud's testimony. Persaud's unavailability was not a result of government action.

Layton contends that "[t]he loss of Liladrie was clearly attributable to the lapse of time, compounded by the inherent difficul-

ty of locating and producing witnesses from a foreign country." The Government cannot reasonably be held responsible for "the inherent difficulty of locating and producing" foreign witnesses, at least when the Government has not concealed the witnesses or removed them from the United States. *Cf. United States v. Mendez–Rodriguez,* 450 F.2d 1, 5 (9th Cir.1971) (2–1) (where defendant was charged with conspiracy to smuggle aliens into the United States and with transporting illegal aliens, government action in deporting three of six witnesses to the offenses before defendant had an opportunity to interview them deprived defendant of due process). Nor can the lapse of time be attributed to the Government. Liladrie apparently died shortly before the second trial commenced. The second trial had been scheduled to begin in October 1985, but it was continued to September 1986 on *defense* motion. *See* Part III(G) *infra.* Liladrie apparently was alive in Guyana as late as August 1986. His unavailability to testify at the second trial, therefore, cannot be attributed to the Government.

Because the Government was not responsible for the unavailability of either Persaud or Liladrie, Layton's inability to obtain their testimony did not constitute a denial of due process. The district court did not err in permitting Kansinally to testify in their absence.

3. *Should the district court have excluded Kansinally's testimony under Fed.R.Evid. 403?*

■ Layton argues that Kansinally's testimony should have been excluded pursuant to Fed.R.Evid. 403. The standards to be applied by the district court under Rule 403, and the standards governing this court's review of the district court's decision, are set forth in Part III(B)(4) *supra.*

Kansinally's testimony was probative of Layton's state of mind. The testimony tended to show that Layton acted with malice and premeditation, rather than accidentally or spontaneously. The profanity that Kansinally attributed to Layton was precisely the aspect of the testimony that

made it probative. The testimony may have prejudiced Layton by causing the jury to dislike him for using profanity. But we cannot conclude that the prejudicial effect of the evidence "substantially outweighed" its probative value. For this reason, and because the district court enjoys wide discretion in admitting evidence over an objection under Rule 403, we affirm the district court's decision not to exclude the Kansinally testimony.

### E. Was Layton's Confession Involuntary And Coerced, Hence Inadmissible Under The Fifth Amendment?

Layton was taken into custody by Guyanese officials at about 5:00 p.m. on November 18, 1978. Four days later, while still in custody, he signed the following statement:

I, Larry Layton, take full responsibility for all the deaths and injuries that took place at the Port Kaituma airstrip. I have begged the Bishop, Jim Jones, that I be allowed to bring down the plane, but he disapproved. My reason for suggesting this was because I felt that these people were working in conjunction with C.I.A. to smear the Peoples Temple and to smear Guyana. I got a gun from a friend of mine, one Pancho, and I went to the airstrip intending to bring down the plane. But when the shooting started, I also started shooting, as I thought it was all too late. I don't know why I did it.

Layton contends that the Guyanese officials coerced him into providing the foregoing statement and that he signed it involuntarily. Accordingly, he argues, admission of the statement into evidence violated his fifth amendment right against self-incrimination.

The district court held a hearing prior to Layton's first trial to determine whether the statement had been given voluntarily. Layton testified that he had been subjected to coercive conditions prior to signing the statement. He claimed that he had been shackled, threatened with a knife and a gun, deprived of food and drink, deprived of light, ventilation and bedding, subjected to interrogation by Guyanese officials throughout the day and night, subjected to mental and physical abuse, and confined in cells that were filthy, infested with insects, and foul smelling.

Five Guyanese police officers who saw Layton prior to his signing the statement rebutted his testimony. They testified that Layton never complained about alleged mistreatment or lack of food, that he was not improperly interrogated, that his statement was taken down, word for word, at his request, and that he was allowed to make a correction, which he initialed, before signing the statement.

At the conclusion of the hearing, the district court judge ruled as follows:

I'm going to deny the motion to suppress. I have assessed the credibility of the witnesses and I find that the statement was a voluntary statement; and ... I find that I don't believe that there were any guns, or knives, or beatings made of the defendant. I think that with respect to the other complaints made concerning food and water and the nature of the shelter in which he found himself, that to the extent that his testimony is believable, the conditions were not such that they would have caused his statement to be involuntary.

I have also weighed the discrepancies, to the extent there were any, between the Guyanese officers and I do not find that they are of such a magnitude that it causes me to disbelieve them in essential respects.

The district court's findings concerning the conditions of Layton's confinement are factual and are reviewed under the clearly erroneous standard. *United States v. Wolf*, 813 F.2d 970, 974 (9th Cir.1987). The court's ultimate conclusion that Layton's statement was voluntary is reviewed *de novo. Id.*

The district court judge indicated that he had "assessed the credibility of the witnesses," and on that basis, he found "that the statement was ... voluntary." The trial court credited the testimony of the Guyanese police officers. Layton has not presented any basis for concluding that the court clearly erred in making its determination.

The trial judge's resolution of the voluntariness issue in this matter is similar to the trial judge's decision in *Wolf.* In that matter, the trial judge stated: "As far as I'm concerned there's no evidence to indicate that the confession or statement ... was made involuntarily. As a matter of fact, everything points to the fact that it was voluntary...." 813 F.2d at 975. In *Wolf,* we interpreted the district court's finding on voluntariness as a finding that the government's version of the facts was true.

We, likewise, interpret the finding of the district court in this case as accepting as true the facts related by the Guyanese police officers. Given the facts testified to by the Guyanese officers and accepted by the district court, there is no basis for concluding that Layton's statement was involuntary or coerced.

### F. Was Venue Proper In The Northern District Of California?

The indictment against Layton was filed on October 9, 1980 in the Northern District of California, the district of his last known residence in the United States. At that time, Layton was still in Guyana in connection with charges filed against him in that country. On or about November 20, 1980, Guyanese authorities released Layton into the custody of F.B.I. agents, who accompanied Layton on his flight back to the United States. Layton's flight landed at an airport located within the Eastern District of New York. There, he was taken from the plane to the district court for arraignment. He was then transported to the Northern District of California, where the case was tried.

Layton argues that venue for trial was improper in the Northern District of California. He bases his argument on 18 U.S. C. § 3238, which provides in pertinent part:

The trial of all offenses begun or committed ... out of the jurisdiction of any particular State or district, shall be in the district in which the offender ... is arrested or is first brought; but if such offender ... [is] not so arrested or brought into any district, an indictment

or information may be filed in the district of the last known residence of the offender....

18 U.S.C. § 3238 (1982).

Layton contends, as he did below, that § 3238 requires that trial be held in the district where the offender was "first brought"—in this case, the Eastern District of New York. He argues that the portion of the statute following the semi-colon provides for the filing of an indictment elsewhere but does not establish an alternative venue for *trial.* The Government acknowledges that Layton was "first brought" into the Eastern District of New York. The Government, however, maintains that when an offender is outside the United States and the indictment is properly filed in the district of the offender's last known place of residence pursuant to § 3238, that district is a proper venue for trial, as well.

■ The proper construction of § 3238 is a question of law which we review *de novo. United States v. McConney,* 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

Treating the question as one of "first impression in this and every other circuit," *United States v. Layton,* 519 F.Supp. 942, 943 (N.D.Cal.1981), the district court concluded that the clause preceding the semi-colon in § 3238 was intended "simply to provide an arbitrary rule of venue for offenses committed outside of the United States." *Id.* at 944. The court noted that the provision for filing an indictment in the district of the offender's last known residence was added to the statute by amendment in 1963. Reviewing the scant legislative history of that amendment, the court found that the purpose of the provision was to establish a procedure "to prevent the running of the statute of limitations where an offender remained abroad but was not clearly a fugitive." *Id.*

The court concluded that the two clauses of § 3238 should be read in the disjunctive —trial is proper in the district where the offender is first brought, *or* in the district of his last known residence if an indictment is filed there before the offender is first

brought into any district. The court reasoned that no purpose would be served by a procedure requiring transfer of a matter from the district in which the indictment is lawfully filed to a district in which the offender happened to be first brought:

> [T]he original purpose of section 3238 was simply to provide an arbitrary rule of venue for offenses committed outside of the United States. The place of venue seems to have been arbitrarily fixed at the place where the criminal process is first set in motion. When the statute was amended in 1963, Congress provided a means of setting that process in motion earlier than had formerly been permitted —that is, by filing an indictment in the district of his last known residence even though the offender has not yet been found in or brought to this country. There appears no reason why Congress would want to interrupt the proceedings, once begun, to move them to the district where the defendant later happened to be brought. Such a system would impose needless expense and inconvenience on the government, and much duplication of labor on the part of prosecuting attorneys, without any increase in convenience to the defendant.

*Id.* at 945.

 We find the district court's reasoning persuasive. We also note that in a case raising the precise issue now before us, the Sixth Circuit considered and adopted the analysis of the district court in this case. *See United States v. Fraser*, 709 F.2d 1556, 1558 (6th Cir.1983) ("Chief District Judge Robert Peckham gave 18 U.S.C. § 3238 thorough consideration in *United States v. Layton*, ... and reached what we consider to be a sound conclusion."). The Sixth Circuit agreed that when an offender is outside the United States and an indictment is filed in the district of the offender's last known residence pursuant to § 3238, venue for trial is proper in that district, notwithstanding that the offender is later "first brought" into another dis-

trict. *Id.* at 1558, 1559. Layton cites no case to the contrary.

The district court did not err in its ruling that venue for trial was proper in the Northern District of California.

**G. Did The Five–Year Delay Before Layton's Second Trial Violate His Sixth Amendment Right To A Speedy Trial?**

Layton argues that the five-year delay between the conclusion of his first trial and the commencement of his second trial "resulted in a clear violation of the right to a speedy trial guaranteed by the Sixth Amendment." [6]

The district court carefully considered Layton's argument and rejected it. In a Memorandum and Order dated June 6, 1986, the district court reviewed the procedural history of the case in detail and reached the following conclusion:

> Defendant has not asked for or wanted a speedy trial. In fact, he has asked for a continuance of the trial at every opportunity. He cannot show substantial prejudice attributable to the delay caused by the government's appeals; and the appeals were not tangential or frivolous, dilatory, or pursued in bad faith. Therefore, the court finds that defendant has not been denied his right to a speedy trial.

 The district court's findings of historical fact concerning the reasons for the five-year delay are reviewed under the clearly erroneous standard. *United States v. Williams*, 782 F.2d 1462, 1465 (9th Cir. 1985). The court's application of law to the historical facts is reviewed *de novo*. *Id.* at 1464–65.

The Supreme Court has formulated a four-factor test "to determine whether a series of continuances infringed upon the defendant's right to a speedy trial." *United States v. Loud Hawk*, 474 U.S. 302, 313, 106 S.Ct. 648, 655, 88 L.Ed.2d 640 (1986). Those factors are the " '[l]ength of delay, the reasons for the delay, the defendant's

---

**6.** The Speedy Trial Clause of the sixth amendment provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial...."

assertion of his right, and prejudice to the defendant.'" *Id.* at 313–14, 106 S.Ct. at 655 (quoting *Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 2191–92, 33 L.Ed.2d 101 (1972)). "[A]n interlocutory appeal by the Government ordinarily is a valid reason that justifies delay." *Id.* 474 U.S. at 315, 106 S.Ct. at 656.

■ In determining whether to charge the Government with the delay occasioned by its interlocutory appeals, the court may consider "the strength of the Government's position on the appealed issue, the importance of the issue in the posture of the case, and—in some cases—the seriousness of the crime." *Id* If the issue raised by the Government's interlocutory appeal was "clearly tangential or frivolous," the delay should be weighed heavily against the Government. *Id.* at 315–16, 106 S.Ct. at 656–57. On the other hand, when the Government's conduct is reasonable, and there has been no showing of bad faith or dilatory purpose on the part of the Government, delays occasioned by the Government's interlocutory appeals should not weigh in favor of a defendant's speedy trial claim. *See id.* at 316, 106 S.Ct. at 656–57. "[R]eversals by the Court of Appeals are prima facie evidence of the reasonableness of the Government's action." *Id.*

Layton did not claim below (and does not claim on appeal) that his first trial was untimely. Therefore, the delay at issue in this matter is from the termination of the first trial (September 26, 1981) to the commencement of the second trial (September 18, 1986), a period of five years.

■ On September 29, 1981, the district court released Layton from custody "on personal recognizance bond pending final disposition of the case." After ruling on motions filed by both sides, the court set a retrial date of February 2, 1982. Retrial was delayed by reason of the Government's interlocutory appeal from the district court's order suppressing Jones' prearrival speeches, Jones' statements to Garry, the so-called "Last Hour Tape," and certain other evidence. We did not decide the Government's first interlocutory appeal until August 10, 1983, when we affirmed in

part and reversed in part the district court's ruling. *Layton,* 720 F.2d at 551. Our mandate was finally issued on January 3, 1984.

The parties thereafter prepared for the second trial. At Layton's request, trial was continued to September 4, 1984. On August 30, 1984, the Government filed an interlocutory appeal from the district court's decision to exclude the "Last Hour Tape" pursuant to Fed.R.Evid. 403, a ground the district court had not considered prior to the Government's first appeal. *See Layton,* 720 F.2d at 563. The Government filed a motion to expedite the appeal, which we granted on September 19, 1984. On July 29, 1985, we affirmed the district court. Our mandate was issued on August 23, 1985. Continuances thereafter were attributable to the defense.

Thus, of the five-year delay, roughly two years are attributable to the defense and three years to interlocutory appeals initiated by the Government. The Government's first appeal was pending in this court for almost two years. This appeal was largely meritorious. Thus, most of the delay occasioned by this appeal should not be weighed against the Government's interest in prosecuting Layton. The Government's second appeal was expedited at the Government's request. The appeal proved not to be meritorious. However, as the district court noted, "the crimes charged [were] very serious, and the government had reason to believe that the evidence would strengthen its case...." We agree with the district court that the issue was not tangential and the appeal was not frivolous. The Government's second appeal, therefore, should not weigh heavily against it.

The defendant did not assert his right to a speedy trial until April 8, 1986. Indeed, the district court found that following the issuance of this court's mandate of August 23, 1985, "the defendant has been anything but anxious to begin the trial. In light of defendant's many requests for continuances and his counsel's assertion that they would cause no harm ..., defendant's conduct weighs heavily against a finding that

defendant's speedy trial rights have been denied."

The defendant himself doubtless suffered because he was under indictment during the entire period of delay before retrial. Prejudice to his defense, however, has not been demonstrated. Layton asserts that because of the delay, witness Durga Persaud was no longer available. But Persaud disappeared in 1981. His unavailability cannot be attributed to the delays occasioned by the Government's appeals. Moreover, Persaud was available during Layton's first trial. The defense did not deem it necessary to call him as a witness. Persaud's unavailability, therefore, does not demonstrate prejudice to the defense.

In summary, of the five-year period of delay between the first and second trials, three years are attributable to the Government's appeals. Neither appeal was undertaken for the purpose of delay. The first appeal was largely meritorious, hence presumptively reasonable. The second appeal was expedited at the Government's request. Layton was apparently content with the delay since he did not assert his right to a speedy trial until April 1986, after the conclusion of the Government's second appeal. Continuances thereafter were attributable to the defense. Layton failed to demonstrate prejudice to his defense by reason of the three-year delay attributable to the Government.

### H. Was The Verdict Supported By Sufficient Evidence?

Layton argues that the evidence presented at trial was insufficient to support the jury's finding of guilt beyond a reasonable doubt. In particular, Layton contends that "[t]he crucial element of proof lacking is the specific intent to kill Ryan and Dwyer."

The district court instructed the jury that the crimes charged against Layton "require proof of specific intent." The court further instructed: "To establish specific intent, the government must prove that the defendant knowingly did an act which the law forbids purposely intending to violate the law. Such intent may be determined through all the facts and circumstances surrounding the case." Layton does not challenge these instructions.

In reviewing the sufficiency of the evidence to support a criminal conviction, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Lane,* 765 F.2d 1376, 1381 (9th Cir.1985). Circumstantial evidence is sufficient to sustain a conviction. *Id.* The jury is entitled to consider the evidence as a whole, including all reasonable inferences that can be drawn therefrom. *United States v. Kipp,* 624 F.2d 84, 85 (9th Cir. 1980).

The evidence showed that Jones and Layton were opposed to Ryan's visit; that Layton felt Ryan and Dwyer were "working in conjunction with C.I.A. to smear the Peoples Temple and to smear Guyana"; that Layton "begged ... Jones that I be allowed to bring down the plane," which, as far as Layton knew, would be carrying Ryan and Dwyer; that shortly before the truck departed Jonestown for the airstrip, Layton conferred with Jones, embraced him, and told him that "the shit has got to stop" and that he (Jones) would be proud of Layton; that shortly after conferring with Jones, Layton obtained a gun, falsely declared his intent to defect with the others, and joined the group on the truck; that at the airstrip, Layton spoke with Joe Wilson, who was known to be armed, and that Wilson appeared to pass a gun to Layton by placing his hand underneath Layton's rain poncho; that when Layton learned there were to be two planes, he insisted on being seated on whichever of the two planes was scheduled to depart first; that Layton thereafter attempted to board the Cessna without being searched and, when confronted, falsely asserted that he had already been searched; that the tractor-trailer carrying Joe Wilson and the other members of the Peoples Temple passed in front of the Cessna, on which Layton was a passenger, without firing at it but proceeded to the larger plane and

opened fire thereon; that Layton, upon hearing the commencement of gunfire, first insisted that the pilot of the Cessna proceed to take off, then pulled his own gun, shot two defectors seated near him, and attempted to shoot a third; and that Layton subsequently admitted having shot the "motherfuckers" and accepted "full responsibility for all the deaths and injuries that took place at the Port Kaituma airstrip."

From this evidence and the evidence summarized elsewhere in this opinion, a rational jury could reasonably infer that Layton knowingly and willfully conspired to kill all the persons who were departing from the airstrip, including Ryan and Dwyer. The jury could reasonably infer that Layton fully intended to accomplish the killings by shooting the pilot of what he expected would be the only plane, thereby causing it to crash. The jury could further infer that when Layton and Wilson discovered that the group would be departing on two planes, they allocated responsibility for killing the passengers on the respective planes. Such an inference is supported by the evidence that Layton insisted on being assigned a seat on the plane scheduled to depart first (the Cessna); that Layton thereafter conferred with Wilson at the airstrip; that the tractor-trailer, on which Wilson was riding, passed the Cessna, leaving it unharmed, then opened fire on the other plane; and that Layton, upon hearing the gunfire, initially insisted that the Cessna take off.

For the foregoing reasons, we reject Layton's argument that the evidence was insufficient to support a finding that Layton had the specific intent to kill Ryan and Dwyer.

## I. Did Layton Receive Ineffective Assistance Of Counsel At Trial?

Layton contends that he received constitutionally ineffective assistance of counsel. He cites the following alleged errors: (1) The grand and petit jury selection procedures deviated from statutory requirements, yet counsel failed to raise a timely objection to those procedures; (2) on cross-examination, counsel accused a prosecution witness of discussing strategy with the

United States Attorney, although there was no factual basis for the accusation; (3) counsel failed to object when the prosecution suggested that witness Charles Garry was somehow associated with the defense team; and (4) counsel failed to call any witnesses for the defense.

A defendant claiming ineffective assistance of counsel must make a two-fold showing. He must demonstrate (1) that counsel's actions were "outside the wide range of professionally competent assistance," and (2) that the defendant was prejudiced by reason of counsel's actions. *Strickland v. Washington,* 466 U.S. 668, 687–690, 104 S.Ct. 2052, 2065–66, 80 L.Ed. 2d 674 (1984). To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068.

■ Assuming that counsel's failure to raise a timely objection to the jury selection procedures constituted ineffective assistance, the error did not prejudice Layton. First, notwithstanding the untimeliness of counsel's objection, the district court proceeded to consider most of Layton's claims on the merits. *Layton,* 519 F.2d at 953–56. Second, the claims that the district court declined to address were simply claims that jury selection failed to comply with "the particular statutory procedures which Congress has deemed presumptively adequate to safeguard defendant's constitutional rights. Neither the Congress nor any court has ever determined that these statutory procedures provide the *only* means of obtaining a fair and impartial jury." *Id.* at 952. In other words, Layton's constitutional right to a fair and impartial jury was not compromised by counsel's untimeliness in raising statutory objections. Indeed, the district court addressed Layton's constitutional claims and rejected them on their merits. *Id.* at 955–58.

Likewise, Layton fails to demonstrate prejudice from counsel's unfounded question on cross-examination or counsel's failure to object to the prosecution's improper suggestion that Garry was associated with

the defense. These incidents appear to have been little more than momentary and insignificant lapses in a long and complex trial. These alleged derelictions of counsel do not undermine our confidence in the outcome of the trial.

Finally, Layton criticizes counsel's failure to call any witnesses for the defense. Because this issue is more fully developed in Layton's appeal from the district court's denial of his motion under 28 U.S.C. § 2255, we address the issue below.

### APPEAL NO. 87–2576

### IV. PERTINENT PROCEDURAL AND FACTUAL BACKGROUND

On January 23, 1987, Layton filed an amended motion for a new trial, which the court elected to treat as a motion to vacate conviction under 28 U.S.C. § 2255. In the motion, Layton contended that he had received ineffective assistance of counsel during his second trial, in violation of the sixth amendment. Specifically, Layton, through newly retained counsel, argued that his defense at trial had been constitutionally inadequate because (1) defense counsel failed to inform him that conviction on Count 2 of the indictment would result in a mandatory sentence of life imprisonment, and (2) defense counsel failed to present a psychiatric defense to the charges.

From April 21, 1987 to April 30, 1987, the district court held an evidentiary hearing on Layton's motion. The motion was denied on June 3, 1987. The district court issued detailed Findings of Fact and Conclusions of Law. As to Layton's first claim, the court found that the defense strategy would have been no different had counsel known, and had he informed Layton, that conviction on Count 2 would carry a mandatory, rather than a discretionary, life sentence. The court ruled, therefore, that Layton had suffered no prejudice by reason of counsel's error. As to Layton's second claim, the court found that counsel's decision not to present a psychiatric defense was a reasonable and fully supportable professional judgment under the circumstances. The court ruled, therefore, that Layton had failed to show that trial counsel's conduct fell below "an objective standard of reasonableness as measured by prevailing professional norms."

The facts on which the district court relied are set forth in Part VI *infra*.

### V. JURISDICTION

The district court had jurisdiction over Layton's motion pursuant to 28 U.S.C. § 2255.

"Appeals from orders denying motions under Section 2255 are governed by the civil rules applicable to appeals from final judgments in habeas corpus actions." *United States v. Hayman,* 342 U.S. 205, 209 n. 4, 72 S.Ct. 263, 267 n. 4, 96 L.Ed. 232 (1952). The court denied Layton's motion on June 3, 1987. On August 14, 1987, Layton filed both a notice of appeal and a motion to extend time for filing notice of appeal. The notice of appeal was untimely. *See* Fed.R.App.P. 4(a)(1). The motion to extend time was timely because it was filed within 30 days after the expiration of the 60–day period for appeal set forth in Fed.R. App.P. 4(a)(1). *See* Fed.R.App.P. 4(a)(5); *Crumpton v. United States,* 496 F.Supp. 774, 776 (C.D.Cal.1980) (district court may extend time for filing notice of appeal on motion filed not more than 30 days after expiration of 60–day period for appeal from denial of motion under § 2255).

On August 24, 1987, the district court granted Layton's motion to extend time, giving him "ten days from the date of this order to file the notice of appeal." The Government does not challenge the district court's order. As noted above, Layton's notice of appeal had been filed on August 14, 1987, prior to the date on which the district court granted his motion to extend time. This sequence of events raises the following question: When the appellant files an untimely notice of appeal accompanied by a motion for an extension of time for filing notice of appeal, does the court's subsequent order granting an extension of time operate nunc pro tunc to validate the notice of appeal?

In *Salazar v. San Francisco Bay Area Rapid Transit Dist.,* 538 F.2d 269 (9th Cir.), *cert. denied,* 429 U.S. 951, 97 S.Ct. 370, 50 L.Ed.2d 319 (1976), the appellant filed an untimely notice of appeal fifty-six

days after entry of final judgment. Forty-one days later, she filed a motion to extend the time for filing the notice of appeal. This court upheld the district court's jurisdiction to enter a nunc pro tunc order validating the untimely notice of appeal, even though the motion, too, was untimely. *Id.* The court ruled that when a notice of appeal is filed within the 30–day extension period during which a motion to extend time may be filed, the district may grant a subsequently filed motion to extend time, thereby validating the notice of appeal nunc pro tunc. Other circuits have reached the same conclusion. *See, e.g., Cuevas v. Reading & Bates Corp.,* 770 F.2d 1371, 1377 (5th Cir.1985) (where appellant simultaneously filed notice of appeal and motion to extend time one day after expiration of initial period for filing notice, and district court thereafter granted motion, appeal was timely), *overruled on other grounds, In re Air Crash Disaster Near New Orleans,* 821 F.2d 1147, 1163 n. 25 (5th Cir. 1987) (en banc); *Moore v. Nelson,* 611 F.2d 434, 436 n. 4 (2d Cir.1979) ("The correct procedure is to file the notice of appeal with the motion to extend time for filing and in no event later than the 30–day extension period.... A notice of appeal may be filed before the motion to extend time has been granted...."); *Torockio v. Chamberlain Mfg. Co.,* 456 F.2d 1084, 1087 (3d Cir.1972) (if notice of appeal is filed within 30–day extension period, "the district court may at any time consider a motion to validate the filing").

Layton's appeal was timely. We have jurisdiction under 28 U.S.C. §§ 1291 and 2255.

## VI. DISCUSSION

A. Did Layton Receive Ineffective Assistance Of Counsel By Reason Of Counsel's Mistaken Belief That A Life Sentence Would Be Discretionary With The Court, Rather Than Mandatory, If Layton Were Convicted On Count Two, And By Reason Of Counsel's Failure To Inform Layton That A Life Sentence Would Be Mandatory?

 As discussed in Part III(I) *supra,* a defendant claiming ineffective assistance of counsel must make a two-fold showing. He must demonstrate (1) that counsel's actions were "outside the wide range of professionally competent assistance," and (2) that the defendant was prejudiced by reason of counsel's actions. *Strickland v. Washington,* 466 U.S. 668, 687–690, 104 S.Ct. 2052, 2064, 2065–66, 80 L.Ed.2d 674 (1984). The district court's findings of fact are reviewed under the clearly erroneous standard. *Woratzeck v. Ricketts,* 820 F.2d 1450, 1453 (9th Cir.1987). Whether the facts suffice to establish " 'the performance and prejudice components of the ineffectiveness inquiry' " is a question that we review *de novo. United States v. Birtle,* 792 F.2d 846, 847 (9th Cir.1986) (quoting *Strickland,* 466 U.S. at 698, 104 S.Ct. at 2070); *see Woratzeck,* 820 F.2d at 1453.

 After a lengthy evidentiary hearing, at which both the lead defense counsel at trial and Layton testified, the district court accepted as true their testimony that throughout the trial, counsel mistakenly believed, and informed Layton, that a sentence of life in prison would be discretionary with the court, rather than mandatory, on conviction under Count 2 (aiding and abetting in the killing of a member of Congress). The court concluded, however, that counsel's error was not prejudicial because even absent the error, Layton would have declined to testify and counsel would have pursued the same trial strategy.

The court relied on the following facts to support its conclusion that Layton's decision not to testify was unrelated to counsel's error:

1. Layton was fully aware of the seriousness of the charges against him and of the possibility that conviction would result in a sentence of life imprisonment. During the first trial, Layton's counsel informed him that he could expect to receive a sentence of life in prison if convicted. (Indeed, Layton's brief on appeal acknowledges that he "was always told to expect the worst, to expect a life sentence....") According to one paralegal member of the defense team,

counsel "always spoke about the penalty in terms of the maximum life." Moreover, during an in-chambers proceeding after the Government had rested in the first trial, the district court judge himself informed Layton "that he could face life imprisonment if found guilty of the charges."

2. Notwithstanding Layton's awareness of the possibility of a life sentence, he was insistent on not testifying. According to his lead trial counsel, Layton was "quite resistant" to testifying: "There was a concentrated effort to have Larry testify. He was always quite resistant to it." According to a paralegal member of the defense team, Layton was "adamant that he would not even consider the idea of testifying." The paralegal's contemporaneous handwritten notes of conversations with Layton reflect Layton's hostility about testifying. Layton never wavered in his opposition to taking the witness stand. At one point Layton informed counsel that he had decided not to testify and did not think anything could change his mind.

3. Layton testified at the evidentiary hearing that he would have insisted on testifying at trial had he known that conviction would mean a mandatory life sentence. The district court found, however, that Layton's testimony was self-serving and not credible, while the contrary testimony of two paralegals was sincere and candid. Moreover, the record contained no evidence to substantiate Layton's claim that the potential sentence had any bearing on his opposition to testifying.

Based on the foregoing facts, the district court concluded that Layton had ample incentive to present as vigorous a defense as possible, regardless of whether the sentence was discretionary life or mandatory life and that Layton would have refused to testify even if counsel had correctly informed him of the potential sentence.

The district court also concluded that counsel's decision not to present a psychiatric defense was unrelated to his misunderstanding of the potential sentence. The court relied on the following facts:

1. In response to the question whether his misunderstanding of the potential sentence had affected his trial strategy, Layton's attorney testified that, in any criminal case, he makes decisions "based upon the worst possible consequence." Counsel stated: "Our strategy was to win, and we based our decisions on the fact that we wanted to win the case.... Whenever I am in a case where there is a range of sentence, I always take the attitude that you always look at the worst possible sentence as the basis on which you make your decisions."

2. The only evidence inconsistent with counsel's testimony was the testimony of Layton's sister, Deborah Layton Cartmell. She testified that lead counsel had told her "he would have proceeded completely differently" had he been aware of the mandatory life sentence. The district court found, however, that Cartmell was not a credible witness. Her testimony, in certain respects, contradicted the testimony of every other witness, including Layton himself. In addition, she levelled certain demonstrably false charges against the defense team. The court also noted her emotional involvement in the case.

3. The defense team had numerous reasons, wholly unrelated to counsel's misunderstanding of the potential penalty, to withhold a psychiatric defense. First, Layton himself was adamantly opposed to presenting such a defense. He did not believe such a defense would be successful, and he "did not believe he was crazy or mentally ill." Second, the defense team benefitted from its experience in the first trial. Counsel's theory of the defense in his closing argument to the jury was that the Government had failed to prove its case beyond a reasonable doubt. The strategy resulted in a jury vote of 11–1 for acquittal on the conspiracy counts and 7–5 for conviction on the aiding and abetting counts. Moreover, post-trial interviews with the jurors indicated to defense counsel that a psychiatric defense might have been counterproductive.

Third, Layton had made a number of highly damaging statements to the psychiatric experts who would have been called to testify for the defense. For example, Lay-

ton told one doctor that he had suggested to Jim Jones that dynamite be used to take down the plane, and that when Jones rejected the idea, Layton suggested that a gun be used.[7] Layton told another doctor that when he reached the Port Kaituma airstrip, he had second thoughts about going through with the plan. Counsel feared that if Layton's statements were elicited from the psychiatrists who had examined him, their testimony would bolster the Government's case and undermine the psychiatric defense by showing Layton's ability to reason and think independently.

Yet another reason that counseled against presenting a psychiatric defense was that each of the defense experts had arrived at a different diagnosis of Layton's mental condition in their psychiatric reports. Counsel was concerned that Fed.R. Evid. 704(b) [8] would be invoked to bar the experts from voicing their ultimate conclusion that Layton was legally insane at the time of the events, leaving them to testify only to their differing diagnoses. Counsel feared that the jury would discount the divergent diagnoses.

Finally, defense counsel perceived that the public had reacted negatively to the psychiatric defenses presented in the widely publicized trials of John Hinckley and Dan White. After conducting voir dire, counsel concluded "that [members of the jury] had an inclination not to accept insanity defenses."

Based on the foregoing facts, the district court found "that knowledge of the mandatory life sentence would not have affected the trial strategy in this case." Accordingly, the court concluded that "there is no 'reasonable probability' that the attorneys' error would have changed the result of the proceeding, and the defendant has failed to demonstrate that his defense was prejudiced."

In support of his claim of ineffective representation, Layton relies upon *Iaea v. Sunn*, 800 F.2d 861 (9th Cir.1986), in which we found that counsel had been unconstitutionally deficient in erroneously advising the defendant "that he was subject to Hawaii's minimum sentencing law, that there was almost no chance of his receiving an extended or life sentence, and that he had a chance to receive probation if he pled guilty." *Id.* at 864. *Iaea* is distinguishable from the instant matter for two reasons.

First, counsel here did not mislead Layton into believing that his sentence would be light. On the contrary, counsel repeatedly warned Layton to expect the worst—a life sentence. Second, in *Iaea*, we addressed only the first question to be answered under *Strickland*—whether counsel's performance was constitutionally deficient. We did not answer the question now facing us—whether counsel's mistake concerning the potential sentence prejudiced the defendant. Indeed, in *Iaea*, we remanded the matter to permit the district court to address the issue of prejudice. *Id.* at 865–66. In the present case, the district court has already held an evidentiary hearing to determine that question. The district court found it unnecessary to assess the effectiveness of counsel's performance, because the court concluded that counsel's error caused Layton no prejudice.

The district court's findings of fact are not clearly erroneous. Those facts support a conclusion that neither counsel nor Layton himself would have opted for a different trial strategy had counsel not been mistaken about the potential sentence. The district court correctly ruled that counsel's error caused Layton no prejudice. Under the *Strickland* test, the error did

---

**7.** Prior to the time he arrived at the airstrip, Layton could not have known that he and Ryan would be departing on different planes. Thus, any evidence that Layton intended to take down the plane would have supported an inference that Layton intended to take Ryan down with him. *See* Part III(H) *supra.*

**8.** Rule 704(b) provides:

No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone. Fed.R.Evid. 704(b).

not result in constitutionally ineffective assistance of counsel.

### B. Did Layton Receive Ineffective Assistance Of Counsel By Reason Of Counsel's Failure To Present A Psychiatric Defense?

In assessing claims of ineffective assistance, we review counsel's performance with great deference. *Woratzeck,* 820 F.2d at 1453. We "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065. "[E]very effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.*

 The district court found that the defense team had fully investigated and prepared a psychiatric defense: "The defense team was prepared to call two psychiatrists and a psychologist, each of whom had examined Layton and concluded that Layton was suffering from a mental disease that rendered him unable to appreciate the wrongfulness of his behavior or to conform his conduct to the requirement of the law."

The defense team was aware, however, that presentation of such a defense would involve serious risks, particularly in light of the damaging statements Layton had given to his doctors. *See* Part VI(A) *supra.* Under questioning at the evidentiary hearing on Layton's § 2255 motion, Layton's lead trial counsel described the dilemma he faced in deciding whether to present a psychiatric defense:

Q. What other problems were there with the psychiatric defense? Let's start with Dr. Tanay, since we have been talking about him this morning.

A. I don't think we can just talk about one doctor. I think you have to talk about the whole defense. It basically is a confession avoidance. It would have presented evidence to the jury which they did not have.

It would have made Mr. Layton part of a conspiracy with Jim Jones and/or Maria Katsarus or Carolyn Layton to go to the airstrip to shoot the pilot of the plane. And the problem with putting on the psychiatric defense is then the statements that Larry told the psychiatrists would all come out. And you would then run—Well, let me put it this way: You would then have it quite clear he was guilty of the conspiracy.

Q. But if he was insane, he would not be guilty?

A. Exactly. In other words, the decision was: Is the insanity defense going to work? Because if it doesn't work, they are going to convict him, period. So the decision made on our assessment was: What did the jury think, number 1, of insanity defenses? And after Hinckley and after Dan White and after voir diring the jurors, we knew that they had an inclination not to accept insanity defenses.

We also knew that one of the weaknesses expressed by most of the jurors were that they did not really—at least a number of them—put much faith in opinions of psychiatrists who gave an examination of an individual years after the event to determine the state of mind of the individual at the time of the event.

In this case most of the psychiatric exams took place two and a half to three years after the incident. And one would have taken place eight years after.

. . . . .

Then one answer that was answered a number of times to the question that [U.S. Attorney] Mr. Russoniello put to them during voir dire was, "Does membership in a consult [*sic,* cult] increase or decrease the person's responsibility?"

And they said: it doesn't make any difference. And basically we are saying that just because you are a member of a cult doesn't mean that you

should be absolved of any type of blame or guilt or responsibility.

In addition to the risks and problems identified in the foregoing testimony, counsel considered Layton's strong resistance to the idea of presenting a psychiatric defense; the near-success achieved at the first trial without the defense; post-trial interviews of members of the first jury which indicated that a psychiatric defense might have confused the issues; and the differing diagnoses reached by the expert witnesses. The defense team also knew that the Government's psychiatric expert would testify that Layton was not legally insane on the day of the events. Counsel "also considered the fact that a successful psychiatric defense would result in Layton's commitment to a mental institution for an indefinite period of time, whereas the strategy pursued at the first trial had persuaded many of the jurors to vote for an outright acquittal on all counts."

Finally, defense counsel had succeeded in eliciting testimony concerning Layton's state of mind during cross-examination of the Government's witnesses. Counsel knew the jury would be instructed that this testimony could be considered in determining whether Layton had the specific intent for the offenses charged. Thus, the district noted, counsel secured favorable "psychiatric evidence from lay witnesses ... without risking the perils of a full-blown insanity defense."

Each of the foregoing findings of fact is supported by the record; none is clearly erroneous. Based on these facts, the district court concluded that counsel's decision not to present a psychiatric defense "was clearly a deliberate tactical choice made after extensive discussion among the attorneys and with the agreement of Layton himself." The court noted that "[t]he defense lawyers vigorously argued their alternative theory that the government had failed to prove its case, a theory that had resulted in a hung jury during the first trial."

We now know, of course, that counsel's strategy proved unsuccessful. Lack of success, however, does not prove ineffective assistance of counsel. Rather, defendant must show that his attorney's conduct transgressed the "wide range of professionally competent assistance," a range within which counsel must be free to make reasonable strategic decisions based on counsel's professional assessment of the facts and circumstances of the case. "In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2065.

We have repeatedly refused to second-guess counsel's strategic decision to present or to forego a particular theory of defense when such decision was reasonable under the circumstances. *See, e.g., Bashor v. Risley,* 730 F.2d 1228, 1241 (9th Cir.), *cert. denied,* 469 U.S. 838, 105 S.Ct. 137, 83 L.Ed.2d 77 (1984) (rejecting ineffective assistance claim where counsel made a tactical decision not to offer negligent homicide defense because he wanted to leave the jury with "the choice of find[ing] [defendant] guilty of deliberate homicide or acquitting him outright"); *Campbell v. Kincheloe,* 829 F.2d 1453, 1462 (9th Cir.1987) (counsel acted within wide range of professionally competent assistance in deciding not to present mitigating evidence at sentencing proceeding, where counsel reasonably believed such presentation would have opened the door to damaging rebuttal evidence); *Woratzeck,* 820 F.2d at 1454 (counsel acted within range of responsible professional assistance in not pursuing "claim of right" defense to robbery and burglary charges, where counsel reasonably believed, *inter alia,* that such defense would have undermined defendant's only complete defense—alibi).

In the present case, counsel's decision to forego a psychiatric defense, a decision in which Layton acquiesced, was a reasonable tactical move. The facts found by the district court demonstrate that counsel had ample reason to believe that such a defense might prove counterproductive. The district court, therefore, correctly concluded that counsel's decision was within the

range of professionally competent assistance. Under the *Strickland* test, Layton was not denied effective assistance of counsel.

### C. Should This Matter Be Remanded For Further Evidentiary Hearings?

 Layton's final argument is that the district court improperly refused to continue the evidentiary hearing "one more day in order to [allow Layton to] secure the testimony of two additional experts." Layton asks us to remand for further hearings "to determine whether the appellant suffered prejudice as a result of the failure of counsel to research the law with regards to sentencing."

The scope of an evidentiary hearing on a motion under § 2255 is committed to the discretion of the district court. *Watts v. United States*, 841 F.2d 275, 277 (9th Cir. 1988). "Section 2255 requires only that the judge give the prisoner's claim 'careful consideration and plenary processing, including full opportunity for presentation of the relevant facts.'" *Id.* (quoting *Blackledge v. Allison*, 431 U.S. 63, 82–83, 97 S.Ct. 1621, 1633, 52 L.Ed.2d 136 (1977)).

The district court's determination that Layton suffered no prejudice by reason of counsel's misunderstanding of the potential sentence rested entirely on the court's factual finding that neither Layton nor his counsel would have pursued a different trial strategy had counsel been correctly informed. *See* Part VI(A) *supra.* Layton fails to explain how additional *expert* testimony could have influenced the court's fact-based determination.

Moreover, Layton's counsel had ample notice of the hearing and engaged in substantial preparation therefor. The hearing itself was lengthy, generating seven thick volumes of transcripts. In addition, the district court permitted counsel to supplement the testimony with numerous affidavits. The court clearly gave Layton's motion "careful consideration and plenary processing."

Under these circumstances, the district court did not abuse its discretion in declining to continue the hearing to permit Layton to present additional expert testimony.

### CONCLUSION

We have carefully considered each of the many claims raised by Layton in these appeals. For the reasons set forth above, we AFFIRM the judgment in No. 87–1071 and AFFIRM the district court's denial of Layton's § 2255 motion in No. 87–2576.